PATON, N.K.A. SAXTON, APPELLEE, *v.* PATON ET AL.; ALLEN COUNTY
CHILD SUPPORT ENFORCEMENT AGENCY, APPELLANT.

[Cite as *Paton v. Paton* (2001), 91 Ohio St.3d 94.]

(No. 99–848—Submitted December 12, 2000—Decided March 7, 2001.)

ALICE ROBIE RESNICK, J.   On June 9, 1998, appellant, the Allen County Child Support Enforcement Agency, filed a "Motion for Review of Child Support, Determination of Arrearages, Lump Sum Judgment, Wage Withholding," in a case involving Ann Paton (n.k.a. Ann Saxton) and her former husband, Michael Paton.

The Patons' marriage was dissolved in 1983, and pursuant to the separation agreement Michael Paton was obligated to pay child support and to maintain major medical and hospitalization insurance for the benefit of his children. Saxton is the residential parent of their youngest daughter, Michelle, who was born in 1982 and has a learning disability.

On August 12, 1998, at a hearing before a magistrate on appellant's motion, Paton and Saxton testified regarding their respective incomes and expenses.   At the time of the hearing, Michelle was enrolled in a public high school and received supplemental security income ("SSI") benefits in the amount of $387 a month ($4,644 a year).   On August 13, 1998, the magistrate filed a decision in which Paton's child support obligation was reduced.

Saxton filed objections to the magistrate's decision because the magistrate treated Michelle's SSI benefits as a financial resource of the child pursuant to R.C. 3113.215(B)(3)(f), and deducted an amount representing Michelle's annual

SSI benefits from her parents' combined annual support obligation.[1] The trial court overruled Saxton's objections and adopted the magistrate's decision and recommendation. A final order modifying child support was filed on October 5, 1998.

On appeal from the trial court's judgment, Saxton argued that the trial court erred when it included Michelle's SSI benefits in the basic child support worksheet. Saxton maintained that these benefits are intended to supplement Michelle's income and should not be used to reduce her parents' support obligation.

On March 16, 1999, the court of appeals reversed the trial court's judgment and remanded the matter for further proceedings. The court of appeals concluded that the SSI benefits Michelle receives as a consequence of her disability "should not be considered when determining the support obligation of her parents. To do so defeats the purpose behind supplemental security income benefits, and it also interferes with the eligibility guidelines of the social security laws." The court of appeals found "as a matter of law that supplemental security income benefits should not be used to decrease the parent's support obligation." The court also noted that the trial court did not comply with R.C. 3113.215(B)(1)(b) and (B)(2)(c) because it failed to journalize findings of fact supporting its deviation from the basic child support schedule.

On April 30, 1999, the Allen County Child Support Enforcement Agency filed its notice of appeal in this court. We allowed the appeal and *sua sponte* ordered that this cause be held for our decision in *Williams v. Williams* (2000), 88 Ohio St.3d 441, 727 N.E.2d 895.[2] See *Paton v. Paton* (1999), 86 Ohio St.3d 1465, 715 N.E.2d 568. We subsequently *sua sponte* lifted the stay and ordered the parties to brief the merits. See (2000), 89 Ohio St.3d 1436, 730 N.E.2d 990.

The issue presented for our determination is whether supplemental security income benefits received by a disabled child constitute a financial resource of the

---

1. In 1998, Michelle received $387 a month ($4,644 a year) in SSI benefits. The combined annual child support obligation of her parents was $6,676. The trial court subtracted Michelle's SSI benefits from her parents' combined annual child support obligation. The remaining $2,032 was to be paid by Saxton and Paton according to their proportional share of the total family income. Paton earned seventy percent of the total family income. Thus, Paton's annual child support obligation was determined to be $1,422. From this, the court subtracted $642 paid by Paton for expenses, leaving $798. This results in a monthly child support obligation of $66.50.

2. In *Williams*, we announced that "[a] disabled parent is entitled to a full credit in his or her child support obligation for Social Security payments received by a minor child due to the parent's disability." *Id.*, 88 Ohio St.3d 441, 727 N.E.2d 895, syllabus.

   *Williams* is distinguishable from the case at bar because in *Williams* it was the obligor, rather than the child, who was disabled. Moreover, the categories of benefits at issue in each of these cases are different. Thus, in *Williams*, we found that "Social Security payments are tantamount to earnings by the disabled parent." *Id.* at 444, 727 N.E.2d at 898.

child pursuant to R.C. 3113.215(B)(3)(f) in order to justify a trial court's deviation from the basic child support schedule.

In any action in which a child support order is issued or modified, a trial court is required to determine the amount of the obligor's child support obligation consistent with the basic child support schedule and guidelines set forth in R.C. 3113.215(D), (E), and (F). R.C. 3113.215(B)(1). The figure calculated in accordance with these guidelines represents the amount of child support due and is rebuttably presumed to be correct. *Id.* A trial court may not deviate from the amount calculated using the guidelines, unless the court considers the factors set forth in R.C. 3113.215(B)(3)(a) through (p), and determines that such an amount "would be unjust or inappropriate and would not be in the best interest of the child." R.C. 3113.215(B)(2)(c)(i). Additionally, the court must journalize the "amount of child support calculated pursuant to the basic child support schedule and pursuant to the applicable worksheet * * * its determination that that amount would be unjust or inappropriate and would not be in the best interest of the child, and findings of fact supporting that determination." R.C. 3113.215(B)(2)(c)(ii); see, also, *Marker v. Grimm* (1992), 65 Ohio St.3d 139, 601 N.E.2d 496, paragraph three of the syllabus.

In order to justify its deviation from the basic child support schedule, the trial court, in the case at bar, relied on R.C. 3113.215(B)(3)(f), which allows a court to consider the "financial resources and the earning ability of the child." The financial resource attributed to Michelle was the $4,644 that she received in annual SSI benefits.

While we do not dispute that SSI benefits are arguably a financial resource of a recipient, we do not believe that SSI benefits are the type of "financial resource" that justifies a trial court's decision to deviate from the basic child support schedules.

"The basic purpose underlying the supplemental security income program is to assure a minimum level of income for people who are age 65 or over, or who are blind or disabled and who do not have sufficient income and resources to maintain a standard of living at the established Federal minimum income level." Section 416.110, Title 20, C.F.R.

The supplemental security income program provides means-tested public assistance to those who qualify. See, generally, Section 1382a, Title 42, U.S.Code. The amount of SSI an eligible individual receives is determined based upon the individual's income and resources. *Id.* If the recipient of SSI is a child who receives child support, the amount of child support received from the absent parent must be taken into account when determining the amount of SSI the child will receive. Section 1382a(b)(9), Title 42, U.S.Code. A recipient's eligibility for continued participation in the program as well as the amount of benefits the

participant receives is reviewed periodically. Section 1382(c)(1), Title 42, U.S.Code.

A majority of jurisdictions that have addressed this issue hold that "a parent is not entitled to a credit in his [or her] child support obligation for SSI benefits received on behalf of a disabled child." *State ex rel. Dept. of Social Serv. Div. of Child Support Enforcement v. Kost* (Mo.App.1998), 964 S.W.2d 528, 530, citing *Hollister v. Whalen* (1997), 244 A.D.2d 650, 663 N.Y.S.2d 918; *Bennett v. Virginia* (1996), 22 Va.App. 684, 694–695, 472 S.E.2d 668, 673; *Kyle v. Kyle* (Ind.App.1991), 582 N.E.2d 842, 846; *In re Marriage of Thornton* (Colo.App. 1990), 802 P.2d 1194, 1196; and *Oatley v. Oatley* (1977), 57 Ohio App.2d 226, 11 O.O.3d 260, 387 N.E.2d 245.

According to one court, "Congress included disabled children under the SSI program in the 'belief that disabled children who live in low-income households are certainly among the most disadvantaged of all Americans and that they are deserving of special assistance in order to help them become self-supporting members of our society.' " *Kyle v. Kyle*, 582 N.E.2d at 846 (quoting H.R.Rep. No. 231, 92nd Cong., 2d Sess., reprinted in 1972 U.S.Code Cong. & Admin. News 4989, 5133–5134).

The factual scenario before us is quite different from one involving a child who has independent financial assets such as an inheritance or income derived from employment. While these assets may lessen a child's need for financial support from his or her parents, SSI benefits, which are unlike other types of financial resources, do not diminish a child's need for support. See *Kost*, 964 S.W.2d at 530. SSI benefits received by a disabled child "are intended to supplement other income, not substitute for it." *Oatley v. Oatley*, 57 Ohio App.2d at 228, 11 O.O.3d at 262, 387 N.E.2d at 246.[3]

The court of appeals correctly observed that reducing a parent's child support obligation by an amount representing the child's SSI benefits "would frustrate the purpose of the federal law by pushing the child's standard of living back below the federal minimum." Such an approach would result in a "stair-step" effect that would increase the child's reliance on federal assistance while decreasing the parents' financial responsibility, because as the child's SSI benefits increase, the parents' support obligation simultaneously decreases. In order to avoid this unintended and absurd result, "[t]he amount of supplemental security income received is modified as the amount of the recipient's other income changes, not vice versa." *Oatley*, 57 Ohio App.2d at 228, 11 O.O.3d at 262, 387 N.E.2d at 246.

---

3. We recognize that *Oatley* is a pre-guidelines case; however, we find that it remains applicable despite subsequent changes in the law.

Parents, to the extent that they are able, have an obligation to support their minor children. In situations where a child is eligible to receive SSI, these benefits are intended to supplement the parents' support obligation, not to reduce it. Consequently, we find that supplemental security income benefits received by a disabled child do not constitute a financial resource of the child pursuant to R.C. 3113.215(B)(3)(f) for purposes of justifying a trial court's deviation from the basic child support schedule. Therefore, we affirm the judgment of the court of appeals.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

---

*Gooding, Huffman, Kelley & Becker* and *John C. Huffman,* for appellee.
*David R. Evans,* for appellant.

---

THE STATE EX REL. WELKER, APPELLANT AND CROSS-APPELLEE, *v.* INDUSTRIAL COMMISSION OF OHIO ET AL., APPELLEES AND CROSS-APPELLANTS.

[Cite as *State ex rel. Welker v. Indus. Comm.* (2001), 91 Ohio St.3d 98.]

(No. 99–912—Submitted November 14, 2000—Decided March 7, 2001.)

---

*Per Curiam.* Appellant-claimant Randall A. Welker suffered a serious industrial injury to his left thumb. When he was transported initially to the closest

emergency room, claimant's thumb hung by only a sliver of skin and muscle. After transfer to another facility, two surgeries were performed to reattach the digit.

The procedure was successful. Three months after the surgery, one of the surgeons, Dr. John Biondi, reported:

"His thumb looks excellent without any signs of infection. * * * X–Rays taken on 7/1/93 show excellent consolidation. He has no pain in the thumb and I am going to send him to therapy for ROM [range of motion] exercises and strengthening."

One month later he wrote:

"X-rays show complete consolidation, his thumb looks quite good and he has good motion at the MP joint although it is fairly stiff out at the IP joint. He has excellent sensation and at this point I want to see him back for a final check in six months."

Claimant eventually returned to his former position of employment. An examination by Dr. Mark E. Weaver in July 1995 assessed an eight percent permanent partial impairment. That November, Dr. Kenneth M. Cardlin described claimant's thumb as "very functional" and having "remarkably preserved function." He reported that "[t]he patient states he is performing most usual activities, although [he] avoids the heaviest of lifting due to uncertainty as to prolonged gripping."

Claimant applied to appellee Industrial Commission of Ohio for scheduled loss compensation under R.C. 4123.57(B) based on "the amputation of the total left thumb."

In a lengthy order, the commission denied an award because (1) the thumb had been successfully reattached and (2) there was no evidence of a permanent and total loss of use of the digit.

The Court of Appeals for Franklin County, in mandamus, upheld the commission's denial of amputation benefits. It held, however, that the commission had not adequately addressed the loss-of-use issue and ordered the commission to give it further consideration. This cause is now before this court upon an appeal and cross-appeal as of right.

R.C. 4123.57(B) [1] provides a compensation schedule for the loss of enumerated body members, designating a number of weeks of compensation for loss of each member. Originally covering loss by amputation—with the obvious exceptions of hearing and sight, which were measured by different standards—compensation was later expanded to include a loss of use. *State ex rel. Walker v. Indus.*

---

1. Formerly R.C. 4123.57(C).

*Comm.* (1979), 58 Ohio St.2d 402, 12 O.O.3d 347, 390 N.E.2d 1190. A compensable loss of use, however, must be " 'to the same effect and extent as if [the body part] had been amputated or otherwise physically removed.' " *Id.* at 403–404, 12 O.O.3d at 348, 390 N.E.2d at 1192, quoting *State ex rel. Gassmann v. Indus. Comm.* (1975), 41 Ohio St.2d 64, 67, 70 O.O.2d 157, 159, 322 N.E.2d 660, 662. Consequently, the only compensable loss of use under R.C. 4123.57(B) is a permanent and total one.

Claimant's entitlement to R.C. 4123.57(B) compensation, by either means, is at issue by virtue of the commission's order—which discussed both—and the court of appeals' decision that ordered the commission to further consider loss of use. Upon review, we affirm that judgment only in part.

Regarding claimant's amputation, one question is raised: Should claimant's eligibility for his scheduled loss award be determined as of the time he was injured or from the point of reattachment and recovery? We find in favor of the latter.

Claimant relies on two cases in advocating the former: *State ex rel. Mansfield Tire & Rubber Co. v. Indus. Comm.* (1973), 40 Ohio App.2d 417, 69 O.O.2d 371, 320 N.E.2d 742; and *State ex rel. Kroger Co. v. Stover* (1987), 31 Ohio St.3d 229, 31 OBR 436, 510 N.E.2d 356. *Mansfield Tire* examined whether a claimant who had lost by accidental amputation most of his thumb and fingers could be compensated for the loss of a hand. In answering affirmatively, the court of appeals stated that the presence of a stump beyond the wrist was not determinative. In so doing, it observed:

"[W]e have evidence of severance of the major portions of both hands without evidence of loss of use. We find that the question of loss of use is irrelevant to the determination of the issue herein. *For if there were a total and complete severance of the hands, but the stumps were fitted with artificial hands, which, through the miracle of modern technology, would restore the ability of claimant to function as well as before the amputation, there would be no question that there would be a compensable severance under the law * * *.*" (Emphasis added.) *Id.* at 419, 69 O.O.2d at 372, 320 N.E.2d at 743.

Claimant offers the highlighted language to support his assertion that medical efforts to ameliorate damage are irrelevant to eligibility for compensation under R.C. 4123.57(B). Claimant, however, overlooks the key distinction between his case and *Mansfield Tire*. His case does not involve a prosthetic device, but, instead, a reattachment of the severed digit itself. As the Rhode Island Supreme Court noted after rejecting a similar attempt to equate the two:

"The employee * * * argues that the substitution of his index finger for a severed thumb should be equated with the furnishing of a prosthetic device. The analogy in our judgment fails. Live tissue from an injured workers' body applied

by a skilled surgeon as a replacement for an injured thumb is not equatable with a prosthetic device purchased from a surgical appliance dealer. One is real; the other artificial." *Fogarty v. State* (1967), 103 R.I. 228, 236 A.2d 247, 248–249.

There is no dispute among the litigants or the judiciary that a prosthesis does not foreclose an amputation award under the statute. See *Kroger, supra.* That is not, however, the issue before us.

Claimant's stronger case is *Kroger,* a decision that generated considerable discussion by a divided court. There, an industrial burn caused an eighty percent loss of vision of the claimant's right eye. A successful cornea transplant ultimately reduced that loss to twenty-five percent. Claimant received an award for the eighty percent loss nevertheless, and Kroger's challenge eventually ended up here.

Controversy centered on the parameters of "uncorrected vision," the vaguely defined measure of loss. Claimant argued that glasses, contacts, and corneal transplants were all corrective means, and since the first two clearly did not prohibit recovery, neither did a transplant. Kroger responded that there was a distinction between optical devices such as glasses and contacts and a cornea transplant.

The majority, in ultimately siding with the claimant, acknowledged that Kroger's "distinction could be made and presents a close case of first impression for this court." *Id.* at 233, 31 OBR at 440, 510 N.E.2d at 360. Kroger's position was rejected, however:

"To make the distinction Kroger asks would require us to find that a corneal transplant is not merely corrective, but restores vision permanently. We decline to accept that position.

"Undeniably Stover sustained the substantial vision loss found by the commission. His loss resulted from severe burning and scarring of his corneas. The question is whether a transplant eliminates the loss of vision or is a correction of vision. A corneal transplant does not necessarily result in permanent or trouble-free restoration. This conclusion is substantiated by the medical testimony in this case which shows that Stover has twice suffered a rejection of the grafts in his right eye, and that at the time there was reason to believe that rejection in the left eye was possible.

"We acknowledge that advances in medical technology might, at some future time, permit the conclusion that a corneal transplant eliminates the loss (as for example the re-setting of broken bones could). But, at the present and on this record, a corneal transplant is no more than a correction to lost vision. Indeed, a patient might well decide not to have a corneal transplant." *Id.* at 233–234, 31 OBR at 440, 510 N.E.2d at 360–361.

Vigorously dissenting were Justices Holmes and Wright. Justice Wright focused on the statutory definition of "loss of uncorrected vision" as "the percentage of vision actually lost as the result of the injury." He noted that the statute did not specify "whether the phrase 'actually lost' refers to the injured employee's condition immediately after the injury, or whether the condition should be evaluated after medical treatment or surgical repair has been performed." *Id.* at 236, 31 OBR at 442, 510 N.E.2d at 362.

Justice Wright stressed that inherent in the award was a *permanent* loss and that permanency was "a clear signal from the legislature that the award is not to be predicated upon the state of the claimant's vision immediately after the industrial injury but, instead, within a reasonable time thereafter so as to allow for the effect of natural healing, medical treatment, surgical repair or rehabilitation." *Id.* at 236–237, 31 OBR at 442, 510 N.E.2d at 363. He added:

"Regrettably, the majority concludes that any improvement to vision as the result of corneal transplants is a correction to vision and cannot be considered when determining a loss of vision award under [former] R.C. 4123.57(C). In reaching this conclusion, the majority states without explanation that 'a corneal transplant is no more than a correction to lost vision.' Presumably, the majority perceives corneal transplants as functionally equivalent to prosthetic devices such as contact lenses or glasses and, therefore, the court has determined that appellee's disabilit[ies] should be determined at the time he sustained the injury and not after advanced medical procedures had been invoked in order to alleviate damage caused by the injury. Such a posture is just plain wrong. More incredibly, the court concludes that 'at some future time' corneal transplants may eliminate the loss, but at present, this procedure constitutes no more than a correction to vision. The majority reaches this conclusion about the current state of the art of corneal transplantation despite *no* such evidence in the record or citation to authority." (Emphasis *sic*.) *Id.* at 237, 31 OBR at 442–443, 510 N.E.2d at 363.

Justice Holmes shared concerns over the permanency of loss:

"[T]here is no doubt whatsoever that the term 'permanent' cannot rationally be applied to a former injury in part of the body, when that part has thereafter been surgically renewed. The *per se* rule adopted by the commission and the majority opinion violates the legislative mandate that temporary injuries, *i.e.*, those of limited duration, receive separate treatment. R.C. 4123.56. By refusing to recognize that surgery may ameliorate particular injuries, including those at issue, the majority has not only directed surgical cures out of the analysis but has allowed the 'permanent loss' to fully encompass an injury of limited duration.

"The operation at issue, a keratoplasty, requires the transplantation of a living organ, the cornea, into the eye of one whose cornea has been injured or

destroyed. Thereafter, the successfully implanted organ receives nourishment and oxygen from the blood of the recipient through the eye's pre-existing blood vessels. If injured, it heals itself. It functions as, and becomes in fact, a living part of the recipient's living tissues, thus eliminating the prior loss. Consequently, to classify the results of this operation as a mere 'correction to vision,' in the same category as a pair of glasses, ignores the obvious intent of the statute as well as its particular terms.

"Moreover, the majority's characterization of keratoplasties as failing to 'eliminate the loss' because of uncertainties in 'the current state of the medical art' ignores the reality that such operations have been regularly performed as standard medical procedures since the 1940s. Nor has the 'current state of the medical art' diminished Stover's expectations and efforts at surgically obtaining normal, healthy eyes, since he had another transplantation surgery immediately following the Industrial Commission's award to him for permanent loss. As a matter of scientific fact, a successful keratoplasty will eliminate, on a permanent basis, any organic loss which Stover originally experienced. To the degree the new corneas do not provide the previously enjoyed standard of vision, their function may be corrected by artificial lenses, *i.e.*, glasses." (Footnotes omitted.) *Id.* at 242–243, 31 OBR at 447–448, 510 N.E.2d at 367.

Permanency of loss was also addressed in Rhode Island—the only other jurisdiction to confront this issue. In *Fogarty, supra*, surgeons fashioned a digit from a damaged finger and reattached it at the site of the accidentally severed thumb. Hand function was greatly enhanced as a result.

In determining the point from which to determine extent of loss, the claimant and employer advanced the same arguments seen here. The *Fogarty* court ruled for the employer, reasoning:

"A full opportunity for achieving whatever beneficial effects medical science may have on an injury must of necessity precede any determination of what has been the percentage of loss of usefulness. Until those effects can, without speculating or delving into mere possibilities, be reasonably foretold, it is impossible to ascertain what will be the percentage of the permanent loss of usefulness. * * * It is permanency which is essential because it is only for a *permanent* loss, not for any loss, that the statute provides benefits." (Emphasis sic.) *Fogarty*, 103 R.I. at 230–231, 236 A.2d at 248.

Adopting claimant's point-of-injury position runs counter to most workers' compensation principles. For purposes of determining permanent total disability, for example, maximum medical improvement can never be assessed until time has established that treatment and rehabilitation have run their course. See Ohio Adm.Code 4121–3–32(A)(1) and its definition of "maximum medical improvement." More broadly, the entire scheme has been adjudicated as generally

unamenable to the application of *res judicata* simply because the passage of time alters a claimant's condition. *State ex rel. B.O.C. Group, Gen. Motors Corp. v. Indus. Comm.* (1991), 58 Ohio St.3d 199, 569 N.E.2d 496.

Equally important, as touched upon early in *Fogarty*, reattachment is the closest possible way of returning the claimant to a preinjury state and eliminates the element of disfigurement which probably played a part in the creation of the scheduled-loss concept.

In this case, it is simply ignoring reality to pretend that claimant's amputation was the end of the story. And continuing jurisdiction can keep the story alive and allow for a scheduled loss award if the reattachment, somewhere down the road, becomes ineffective. At this time, however, claimant has not sustained the requisite loss to qualify for an award under R.C. 4123.57(B).

Turning to the issue of loss of use without regard to amputation, the court of appeals found through its magistrate that the commission did not adequately discuss the issue, based on *State ex rel. White v. U.S. Gypsum Co.* (1990), 49 Ohio St.3d 134, 551 N.E.2d 139. That case, however, is distinguishable. In *White*, the commission denied a loss-of-use award based on reports that specifically found that claimant *did* have a permanent and total loss. The court ordered the commission to further clarify its order. Here, the commission cited evidence that did indeed say that claimant had remarkably preserved function in the reattached thumb, which contradicts a finding of loss of use. Consequently, a writ of mandamus is inappropriate.

That portion of the court of appeals judgment that found claimant ineligible for compensation for amputation is affirmed. The balance is reversed.

*Judgment reversed in part*
*and affirmed in part.*

MOYER, C.J., F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

DOUGLAS and RESNICK, JJ., dissent and would affirm the judgment of the court of appeals in its entirety.

---

*Green, Haines, Sgambati, Murphy & Macala Co., L.P.A., Ronald E. Slipski* and *Steven L. Paulson,* for appellant and cross-appellee.

*Betty D. Montgomery,* Attorney General, and *Craigg E. Gould,* Assistant Attorney General, for appellee and cross-appellant Industrial Commission.

*Manos, Pappas & Stefanski Co., L.P.A., Leonard J. Pappas* and *James A. Neff,* for appellee and cross-appellant Northeast Fabricators, Inc.

THE STATE EX REL. GRECO, APPELLANT, *v.* CONRAD, ADMR.,
ET AL.; INDUSTRIAL COMMISSION OF OHIO, APPELLEE.

[Cite as *State ex rel. Greco v. Conrad* (2001), 91 Ohio St.3d 105.]

(No. 99–946—Submitted November 28, 2000—Decided March 7, 2001.)

*Per Curiam.* The facts in this case are scant. What is known is that appellant-claimant Anthony Greco worked for T.H.E. Roofing & Sheet Metal Company. On November 17, 1995, claimant was assigned to clean the gutters of a church. He did so "by leaning over the edge of the roof and removing the debris by hand." He was not wearing a safety belt or line.

The roof pitch was approximately 3/12 to 4/12, and the distance from the top edge of the gutter to the ground was approximately twenty-four feet and eleven inches. While cleaning, claimant fell from the roof and was severely injured. There were no witnesses to the fall.

Claimant alleged several specific safety violations ("VSSR") involving safety lines, belts, and lanyards. An investigation by the Industrial Commission of Ohio, appellee, revealed little. Company employees said only that due to the roof's low pitch, no safety equipment was used. Claimant averred that the company had never provided or required the use of safety belts or lines.

The commission investigator took several pictures of the accident site and two photos at company headquarters on his visit there on January 8, 1997. The first picture showed a safety harness, belt, and lifeline and was apparently taken in the employer's storeroom. The second showed a roofer's bracket. In addition, receipts were provided showing the purchase of similar items in early 1995.

The commission denied claimant's application, writing:

"Investigator Creager did establish a distance of 24′ 11″ from the church's roof to the ground. Since the uncontroverted evidence finds that the work place was less than 25′ above the ground, OAC 4121:1–3–03(L) likewise is inapplicable.

"Investigator Creager's measurements are uncontroverted.

"Employer's invoices * * * substantiate the recent purchase of the safety equipment mandated by OAC 4121:1–3–03(J). The photographs 1 & 2 at Exhibit # 1, moreover, depict equipment evidently soiled from usage, and at least one roof bracket showing signs of usage. This supports employer's contentions and detracts from the credibility of claimant's allegations. Employer, therefore, is held to have been in compliance with OAC 4121:1–3–03(J)."

Reconsideration was denied.

Claimant filed a complaint in mandamus in the Court of Appeals for Franklin County, alleging that the commission abused its discretion in denying his VSSR application. The court of appeals disagreed and denied the writ.

This cause is now before this court upon an appeal as of right.

Ohio Adm.Code 4121:1–3–03(J)(1) and (L)(1) are the focus of our inquiry. The commission found no violations, and the court of appeals agreed. For the reasons to follow, we find a violation of Ohio Adm.Code 4121:1–3–03(J)(1).

At the time of claimant's accident, Ohio Adm.Code 4121:1–3–03(J)(1) required:

"Lifelines, safety belts and lanyards shall be provided by the employer and it shall be the responsibility of the employee to wear such equipment when * * * exposed to hazards of falling when the operation being performed is more than fifteen feet above ground * * *." 1979–1980 Ohio Monthly Record 4–25.

Controversy centers on the word "provided," which is relevantly defined for purposes of the above rule as "to make available." Ohio Adm.Code 4121:1–3–01(B)(20). All agree that the named equipment was not at the accident/job site. "Availability" was found nevertheless based on two pictures showing soiled equipment in the employer's storeroom and the invoices for purchases of safety equipment.

The equation of possession with availability is troubling. An employer can own safety equipment, but if it is locked in a remote warehouse, it is hardly "available." Possession is meaningless without an additional element—employee accessibility.

Accessibility was a key element in finding availability in *State ex rel. Mayle v. Indus. Comm.* (1999), 86 Ohio St.3d 74, 711 N.E.2d 687. *Mayle* involved a fatal fall from an electric transmission tower. As here, no safety belts or other similar equipment was on site. *Mayle* nevertheless found availability based on two things: (1) equipment accessibility and (2) evidence that claimant's lack of a belt stemmed from a personal preference and an industry-wide pattern of avoiding such equipment as posing an unacceptable risk of electrocution. Regarding the former, we stressed evidence indicating that prior to every job, the crew assembled at the home office, where the employees had the chance to obtain whatever safety equipment was needed for the job. Further testimony revealed

that the employer would deliver to the site any safety equipment that a worker subsequently requested.

In this case, the commission points to soilage on the employer's equipment as evidence of use, and, therefore, accessibility. The flaw in this logic is that the photos were taken *fourteen months* after the accident. Yes, there are equipment purchase invoices that predate the accident, but these establish only that the employer owned some safety equipment on the date of injury. They do not establish accessibility, nor does the soilage on the equipment. That soilage could have just as easily occurred in the fourteen months after the accident as before.

We accordingly find that the commission's denial of claimant's application was not based on "some evidence" of equipment availability on the date of injury, and we further find that the commission abused its discretion in finding no violation of Ohio Adm.Code 4121:1–3–03(J)(1).

In light of the above finding, analysis of Ohio Adm.Code 4121:1–3–03(L)(1) is unnecessary. If Ohio Adm.Code 4121:1–3–03(J)(1) applies, as we have found, then the use of safety lines, etc., is not "impractical" and (L)(1) is irrelevant.

That portion of the court of appeals' judgment that found no violation of Ohio Adm.Code 4121:1–3–03(J)(1) is reversed. The balance of the judgment is affirmed.

*Judgment affirmed in part*
*and reversed in part.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY and PFEIFER, JJ., concur.

COOK and LUNDBERG STRATTON, JJ., dissent.

---

COOK, J., **dissenting.** Based on the rationale set forth in the decision of the court of appeals' magistrate, I respectfully dissent.

LUNDBERG STRATTON, J., concurs in the foregoing dissenting opinion.

---

*Mark B. Weisser,* for appellant.

*Betty D. Montgomery,* Attorney General, and *Jon D. Grandon,* Assistant Attorney General, for appellee.

SOUTHWEST OHIO REGIONAL TRANSIT AUTHORITY, APPELLEE, *v.*
AMALGAMATED TRANSIT UNION, LOCAL 627, APPELLANT.

[Cite as *Southwest Ohio Regional Transit Auth. v. Amalgamated Transit Union, Local 627* (2001), 91 Ohio St.3d 108.]

(No. 00–21—Submitted November 14, 2000—Decided March 7, 2001.)

LUNDBERG STRATTON, J. Appellee, Southwest Ohio Regional Transit Authority ("SORTA"), operates a mass transit system in the greater Cincinnati area. Appellant, Amalgamated Transit Union, Local 627 ("Union"), is a labor union that represents certain SORTA employees, including bus maintenance workers. SORTA and the Union negotiated a collective bargaining agreement ("CBA"). Under the CBA, SORTA or the Union may submit to arbitration any otherwise unresolved grievance that arises from the interpretation or application of its terms. The CBA also provided that "[t]here shall be no discharge, suspension or other disciplinary action without sufficient cause."

In 1995, SORTA adopted a drug-and-alcohol-prevention policy ("drug policy"), which subjects "safety sensitive" employees to random drug testing. The test employed by SORTA incorporates federal standards under which an employee is tested to determine if certain metabolites, which are a byproduct of marijuana use, are present in the employee's urine. SORTA describes its drug policy as a "zero tolerance" policy; in other words, if an employee tests positive, the employee is terminated.

Marc Sundstrom was a Union member who was employed by SORTA as a bus repairperson, which was classified as a "safety sensitive" position. Sundstrom's position required him to have a commercial driver's license in order to test drive

the buses that he repaired. On February 10, 1997, Sundstrom was subjected to a random drug test pursuant to SORTA's drug policy. Sundstrom tested positive for metabolites in his blood and was summarily discharged pursuant to SORTA's zero tolerance policy.

The Union filed a grievance on Sundstrom's behalf, which was referred to arbitration pursuant to the CBA. The arbitration panel sustained the grievance in part and denied it in part. The panel found that the decision to discharge Sundstrom was based solely upon his violation of the drug policy. The panel found that SORTA's drug policy was facially valid and that testing positive was a dischargeable offense. However, the panel determined that the drug policy's automatic discharge sanction for testing positive conflicted with, and therefore violated, the "sufficient cause" discharge standard set out in the CBA. After considering the length of Sundstrom's service and his lack of any prior disciplinary problems, the panel found that Sundstrom had been discharged without sufficient cause. Accordingly, the panel decided that Sundstrom should be reinstated. However, the panel denied Sundstrom back pay, required him to complete a drug-and-alcohol rehabilitation program, and subjected him to unannounced drug testing. The award stated that failure to comply with any of these requirements or a positive drug test would result in Sundstrom's immediate dismissal.

SORTA appealed the arbitration award to the Court of Common Pleas of Hamilton County. The court confirmed the award, holding that it drew its essence from the CBA and was not unlawful, arbitrary, or capricious.

SORTA appealed to the Hamilton County Court of Appeals. The court of appeals reversed the arbitration award, holding that "reinstating Sundstrom, a safety-sensitive employee who tested positive for marijuana while on the job, would violate the explicit, well-defined and dominant public policy to ensure the safety of the passengers of common carriers and the general public by suppressing illegal drug use among transportation employees."

This cause is now before this court pursuant to the allowance of a discretionary appeal.

The case presents two issues before this court. The first is whether the award should be vacated because it fails to draw its essence from the CBA. The second is whether the award is against public policy and should be vacated as being unlawful.

### The Award Draws its Essence from the CBA and is not Arbitrary or Capricious

Public policy favors arbitration. *Brennan v. Brennan* (1955), 164 Ohio St. 29, 57 O.O. 71, 128 N.E.2d 89, paragraph one of the syllabus. "The whole purpose of

arbitration would be undermined if courts had broad authority to vacate an arbitrator's award." *Mahoning Cty. Bd. of Mental Retardation & Dev. Disabilities v. Mahoning Cty. TMR Edn. Assn.* (1986), 22 Ohio St.3d 80, 83–84, 22 OBR 95, 98, 488 N.E.2d 872, 875. "Because the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the facts and the meaning of the contract that they have agreed to accept. Courts thus do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts. To resolve disputes about the application of a collective-bargaining agreement, an arbitrator must find facts and a court may not reject those findings simply because it disagrees with them. The same is true of the arbitrator's interpretation of the contract." *United Paperworkers Internatl. Union, AFL–CIO v. Misco, Inc.* (1987), 484 U.S. 29, 37–38, 108 S.Ct. 364, 370–371, 98 L.Ed.2d 286, 299. Accordingly, courts are limited to determining whether an arbitration award is unlawful, arbitrary, or capricious and whether the award draws its essence from the CBA. *Findlay City School Dist. Bd. of Edn. v. Findlay Edn. Assn.* (1990), 49 Ohio St.3d 129, 551 N.E.2d 186, paragraph two of the syllabus, superseded by statute on other grounds, see *Cincinnati v. Ohio Council 8, Am. Fedn. of State, Cty. & Mun. Emp., AFL–CIO* (1991), 61 Ohio St.3d 658, 661–662, 576 N.E.2d 745, 750. An award draws its essence from the CBA when there is a rational nexus between the CBA and the award. *Mahoning Cty. Bd. of Mental Retardation,* 22 Ohio St.3d 80, 22 OBR 95, 488 N.E.2d 872, paragraph one of the syllabus.

SORTA states that it adopted its drug policy pursuant to Section 26(a) of the CBA. SORTA argues that the award, that reinstated Sundstrom, did not draw its essence from the CBA because it ignored the automatic discharge sanction required by SORTA's drug policy. We disagree.

We find that any sanction for a violation of a rule adopted by SORTA pursuant to Section 26(a) of the CBA was subject to the "sufficient cause" standard for dismissing employees found in Section 3(b) of the CBA. See *Local No. 7, United Food & Commercial Workers Internatl. Union v. King Soopers, Inc.* (C.A.10, 2000), 222 F.3d 1223. In *King Soopers,* the union and King Soopers negotiated a CBA that provided that no union employee would be terminated without "good and sufficient cause." *Id.* at 1225. However, King Soopers also unilaterally adopted a "no call/no show" policy that provided that three unexcused absences would result in immediate discharge. Lally Parbhu, a union member and employee at King Soopers, failed to provide an excuse for a two-week absence. King Soopers dismissed her pursuant to the no-call/no-show policy.

The union filed a grievance protesting Parbhu's dismissal. The arbitrator issued an award that reinstated Parbhu, finding that while it was possible that a

violation of the no-call/no-show policy could be grounds for immediate termination, Parbhu's discharge did not meet the test of just cause.

King Soopers appealed, and the appellate court affirmed the arbitrator's award that reinstated Parbhu, reasoning that "[a]lthough the CBA negotiated between King Soopers and the Union gives King Soopers 'the right * * * to make necessary reasonable rules and regulations for the conduct of business, providing that said rules and regulations are not in conflict with the terms of [the CBA] in any way,' * * *, *the right to make such rules is not the right to equate the violation of such rules with 'good and sufficient cause' for termination. To hold otherwise would be to allow King Soopers to unilaterally define the meaning of 'good and sufficient cause,' a right which was not contemplated by the CBA and for which King Soopers must negotiate with the Union.*" (Emphasis added.) *Id.* at 1227.

We agree with, and apply, the reasoning of *King Soopers* to this case. While SORTA's drug policy may be facially valid, we find that SORTA did not have the right to *unilaterally* adopt automatic termination without possibility of reinstatement as a sanction for testing positive, because such a sanction conflicts with the "sufficient cause" requirement for dismissal found in Section 3(b) of the CBA. Just as the court noted in *King Soopers*, allowing SORTA to enforce automatic termination would allow an employer to unilaterally adopt a sanction that conflicts with the sufficient-cause requirement for dismissal that was negotiated into the CBA, thereby undermining the integrity of the entire collective bargaining process. The proper avenue for SORTA to adopt such a sanction would be through the collective bargaining process, not through a unilateral decision.

Section 26(a) of the CBA, under which SORTA contends that it adopted its drug policy, further supports our conclusion. It states that SORTA *"will provide that there is no conflict between orders and rules* [adopted pursuant to Section 26] *and the provisions of this contract."* (Emphasis added.) Thus, by adopting immediate dismissal as a sanction for violating the drug policy, SORTA created a conflict with Section 3(b) of the CBA, which allows employees to be terminated only for sufficient cause.

Therefore, we find that the automatic dismissal sanction under SORTA's drug-prevention policy violates the sufficient-cause requirement for dismissal of the CBA. Thus, because the panel's award reinstating Sundstrom was based on the sufficient-cause standard set out in the CBA, the award drew its essence from the CBA and was not arbitrary or capricious.[1]

---

1. SORTA argues that the arbitration award fails to draw its essence from the CBA because the panel failed to enforce the automatic discharge sanction pursuant to SORTA's drug policy. However, SORTA does not specifically argue that the award was arbitrary or capricious. That, in

*The Award is Lawful because it is not against Public Policy*

SORTA further contends, and the appellate court held, that even if the award draws its essence from the CBA, public policy against drug use requires mandatory termination of a "safety sensitive" employee who fails a drug test. We must examine whether there is such a public policy that would render the award reinstating Sundstrom unenforceable.

In *W.R. Grace & Co. v. Local 759, Internatl. Union of Rubber, Cork, Linoleum & Plastic Workers of Am.* (1983), 461 U.S. 757, 766, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298, 307, the United States Supreme Court held if the interpretation of a CBA violates public policy, the resulting award is unenforceable. However, the *Grace* court also cautioned that the public policy "must be well defined and dominant, and is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" *Id.,* quoting *Muschany v. United States* (1945), 324 U.S. 49, 66, 65 S.Ct. 442, 451, 89 L.Ed. 744, 755. Thus, vacating an arbitration award pursuant to public policy is a narrow exception to the "hands off" policy that courts employ in reviewing arbitration awards and "does not otherwise sanction a broad judicial power to set aside arbitration awards as against public policy." *Misco,* 484 U.S. at 43, 108 S.Ct. at 373, 98 L.Ed.2d at 302. Accordingly, we must examine "laws and legal precedents" in order to determine if there is any public policy that would render the award reinstating Sundstrom unenforceable.

SORTA argues that the General Assembly has codified a public policy against use of alcohol or controlled substances by transportation employees in R.C. 4506.15. We agree with this assertion. However, we find that this statute does not indicate that public policy precludes *reinstatement* of a "safety sensitive" employee who tests positive for alcohol or a controlled substance. Ohio punishes persons who drive commercial motor vehicles "while having a measurable or detectable amount of * * * alcohol or a controlled substance in his * * * urine" or "while under the influence of a controlled substance" by suspending the guilty party's commercial driver's license. R.C. 4506.15(A) and (C); 4506.16. However, except where a person has multiple convictions or where the person is convicted of an offense involving drug trafficking, there is no permanent termination of the guilty party's commercial license. Even certain persons who have their license revoked "for life" may have their license reinstated if they undergo a rehabilitation program. Ohio Adm.Code 4501:1–1–26. Thus, we find that this law does not dictate a public policy that precludes a person who tests positive for a controlled substance from having a second chance.

---

conjunction with our failure to find any evidence to support such a conclusion, persuades us to conclude that the award was not arbitrary or capricious.

In Ohio, two appellate districts have held that enforcement of an arbitration award reinstating a safety-sensitive employee who tested positive for a controlled substance or alcohol is against public policy. See *Cleveland Bd. of Edn. v. Internatl. Bhd. of Firemen & Oilers Local 701* (1997), 120 Ohio App.3d 63, 696 N.E.2d 658 (Eighth District); *Southwest Ohio Regional Transit Auth. v. Amalgamated Transit Union, Local 627* (Sept. 28, 1994), Hamilton App. No. C–930423, unreported, 1994 WL 525543. In examining Ohio law, both decisions relied upon *Dietrich v. Community Traction Co.* (1964), 1 Ohio St.2d 38, 30 O.O.2d 22, 203 N.E.2d 344, which stated that "[i]t is generally recognized that the duty of a common carrier of passengers is to exercise the highest degree of care for the safety of its passengers." *Id.* at 41, 30 O.O.2d at 23, 203 N.E.2d at 347. The courts in both *Local 701* and *Local 627* found that the duty defined in *Dietrich* precludes the reinstatement of a safety-sensitive employee who tested positive for a controlled substance or alcohol as a matter of public policy. We find that the law suggests something quite different.

Consistent with a common carrier's duty to exercise the highest degree of care for its passengers, and pursuant to its authority to regulate motor transportation companies under R.C. 4921.04, the Public Utilities Commission of Ohio has adopted certain United States Department of Transportation safety standards. See Ohio Adm.Code 4901:2–5–02(A). In particular, the Public Utilities Commission has adopted Section 382, Title 49, C.F.R., which addresses testing of commercial motor vehicle operators for alcohol and controlled substances.

Because Ohio law relies on and incorporates federal laws and regulations, in particular Part 382, Title 49, C.F.R., we must examine federal policy. In an almost identical case, the United States Supreme Court has recently examined whether *federal law* and implementing *regulations* that require drug testing of safety-sensitive employees, including Part 382, Title 49, C.F.R., make an arbitration award reinstating such an employee who tested positive for a controlled substance unenforceable pursuant to public policy. *Eastern Associated Coal Corp. v. United Mine Workers of Am., Dist. 17* (2000), 531 U.S. ——, 121 S.Ct. 462, 148 L.Ed.2d 354. In *Eastern*, Smith, a union employee, tested positive for drugs and was immediately terminated. An arbitrator determined that Smith's positive drug test did not amount to "just cause" for discharge pursuant to the CBA. The award was upheld on appeal.

On appeal to the Supreme Court, Eastern argued that public policy against drug use, as reflected in the federal law and regulations that require drug testing, rendered the arbitration award reinstating Smith unenforceable. The court determined that "the question to be answered is not whether Smith's drug use itself violates public policy, but whether the agreement to reinstate him does so." *Eastern*, 531 U.S. at ——, 121 S.Ct. at 467, 148 L.Ed.2d at 361.

In determining if there was a public policy to render the award unenforceable, the court examined the Omnibus Transportation Employee Testing Act of 1991, Section 31306, Title 49, U.S.Code, and DOT's implementing regulations. The court found that "these expressions of positive law embody several relevant policies," including "policies against drug use by employees in safety-sensitive transportation positions and in favor of drug testing," as well as a "policy favoring rehabilitation of employees who use drugs." *Id.*, 531 U.S. at ——, 121 S.Ct. at 468, 148 L.Ed.2d at 363. Pertinent to its conclusion was the court's consideration of Part 382, Title 49, C.F.R., which defines the circumstances under which a safety-sensitive employee who tested positive for drugs may return to work. *Id.*, 531 U.S. at ——, 121 S.Ct. at 468, 148 L.Ed.2d at 362, citing Section 382.605, Title 49, C.F.R. Applying this holding, the court determined that the award did not condone Smith's conduct or ignore the risk drug use poses to the public. Instead, the award punished Smith by suspending him for three months without pay, requiring him to pay the arbitration costs for both sides, subjecting him to substance-abuse treatment and testing, and making it clear that another failed test would result in discharge. *Id.* Thus, the court held that the award reinstating Smith was not contrary to any "explicit," "well defined," "dominant" public policy. *Id.*, 531 U.S. at ——, 121 S.Ct. at 469, 148 L.Ed.2d at 364.

Because Ohio has adopted Part 382, Title 49, C.F.R., and because Ohio has no other law or legal precedent mandating termination, we hold that Ohio has no dominant and well-defined public policy that renders unlawful an arbitration award reinstating a safety-sensitive employee who was terminated for testing positive for a controlled substance, assuming that the award is otherwise reasonable in its terms for reinstatement.

The arbitration award herein punished Sundstrom by denying him back pay. It also required Sundstrom to attend a rehabilitation program, to pass a return-to-work drug test, and to take unannounced drug tests upon reinstatement. Failure to complete rehabilitation or a positive test result would result in Sundstrom's immediate discharge. Considering the length of Sundstrom's employment and his lack of disciplinary problems, we find that the terms for reinstatement were reasonable in that they imposed punishment and provided safeguards to prevent recidivism.

Thus, we hold that the award reinstating Sundstrom was not against public policy, and thus was lawful.[2]

---

2. SORTA's own drug policy, based on federal regulations that have provisions similar to those addressed in *Eastern,* belies any safety concern requiring dismissal of all employees who have used drugs. SORTA's drug policy provides a second chance to those employees who voluntarily come forward and admit to drug use prior to any positive test. These employees may retain their position with SORTA contingent upon completion of the rehabilitation program and continuing

This holding does not imply that drug use may never be a basis for automatic discharge. An employee's overall disciplinary record, the egregiousness of the infraction, problems with recidivism, or other issues could constitute sufficient cause for discharge. Of course these are matters that are contingent upon the terms of the CBA, as well as the arbitrator's interpretation of those terms.

## Conclusion

We hold that the arbitration award reinstating Sundstrom drew its essence from the CBA and was not unlawful, arbitrary, or capricious. Accordingly, we reverse the judgment of the court of appeals and order that the arbitration award be reinstated.

*Judgment reversed.*

MOYER, C.J., RESNICK, F.E. SWEENEY and PFEIFER, JJ., concur.

DOUGLAS, J., concurs in judgment.

COOK, J., dissents.

---

**COOK, J., dissenting.** Like the majority, I disagree with the court of appeals' holding that reinstating Sundstrom would violate an explicit, well-defined, and dominant public policy. I would, nonetheless, affirm the court of appeals' judgment because I agree with the Southwest Ohio Regional Transit Authority ("SORTA") that the panel's award did not draw its essence from the CBA.

On the one hand, the majority concedes that SORTA's drug policy may be "facially valid." On the other hand, the majority finds that the policy "violates the sufficient-cause requirement for dismissal of the CBA." But neither the majority nor the panel can have it both ways. The arbitration panel in this case found it difficult to determine whether the union had ever actually challenged the facial validity of the drug policy. The panel concluded, however, that to the extent the union *did* challenge the facial validity of the rule, "the Authority's Policy is facially valid." This valid rule was thereby "incorporated into the collective bargaining agreement and [had] the force of contract language." *Mountaineer Gas Co. v. Oil, Chem. & Atomic Workers Internatl. Union* (C.A.4, 1996), 76 F.3d 606, 610. Under the express terms of Section 3(d) of the CBA, the panel had "no authority to alter, amend, modify, add to, subtract from or change the terms" of the agreement.

---

---

*Dinsmore & Shohl LLP, Charles M. Roesch* and *Robert J. Reid,* for appellee.

*Kircher, Robinson & Welch* and *James B. Robinson; Jubelirer, Pass & Intrieri, P.C.,* and *Ernest B. Orsatti,* for appellant.